## Case No. 17,556.
### WHITE v. RED CHIEF.
[1 Woods, 40.] [1]
Circuit Court, D. Louisiana. April Term, 1870.

CONFISCATION OF HOSTILE VESSEL—CHARACTER OF OWNER—RESIDENCE WITHIN INSURRECTIONARY LINES.

1. A capture of a steamer, within the insurrectionary district, by the forces of the United States, vested in the government of the United States an absolute title to the property, without the necessity of any legal condemnation.

2. The fact that the libellant, who was at the time of the capture resident in the district in insurrection, afterwards came into the United States and took the oath prescribed by the acts of congress, could not divest the title of the government.

[Appeal from the district court of the United States for the district of Louisiana.]

C. S. Kellogg and R. H. Shannon, for libellant.

C. Roselius and R. Waples, for respondent.

WOODS, Circuit Judge. The libel in this case was filed June 3, 1864, and alleges in substance that libellant is a resident of the city of New Orleans, and that the steamer libelled was in charge of S. B. Holabird, chief quartermaster of the department of the Gulf. That libellant is the lawful owner of the steamer Red Chief, and for a long time had the possession of her as owner. That on the 11th day of March, 1863, libellant purchased said steamer at Shreveport, Louisiana, for his own individual use and profit. That on the 12th of March, 1863, while libellant was making a trip on his own account for private parties on the Mississippi and Red rivers, the so-called Confederate States government seized and impressed said boat against his will and consent. That a military force with an officer was sent on board said steamer and he was compelled to submit to their orders. That the so-called Confederate States government, by its officers and men, took said steamboat to Port Hudson, where it remained till that place surrendered to the United States forces on July 8, 1863, when said boat was taken in possession and turned over to said Holabird, chief quartermaster of the department of the Gulf. That libellant is and ever has been a loyal citizen of the United States, and has never aided or abetted the Rebellion by word or deed, but has taken the oath prescribed by the proclamation of the president of December 8, 1863, and before then, to-wit, on October 15, 1863, had taken an oath to support, protect and defend the United States against internal, civil and foreign enemies.

This is the case as stated by the libellant, and upon his own showing, I think his libel ought to be dismissed. According to the libel the libellant, at the time of his purchase of the Red Chief, and of her seizure by the Confederate forces, was resident and doing

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

business within the enemies' territory, and whatever his private sentiments may have been, he was in contemplation of law an enemy of the United States. "This court," says Mr. Chief Justice Chase, in Mrs. Alexander's Cotton, 2 Wall. [69 U. S.] 419, "cannot inquire into the personal character and dispositions of individual inhabitants of every territory. We must be governed by the principle of public law, so often announced from this bench as applicable alike to civil and international wars, that all the people of each state or district in insurrection against the United States must be regarded as enemies, until by the action of the legislature and the executive, 'or otherwise that relation, is thoroughly changed." This steamer then was not only the property of an enemy, but was taken from him by the troops of the insurgents, and used in carrying on the war against the United States. While so used, she was captured by the military forces of the United States. Even in the possession of the libellant, the capture would have been justified, by the peculiar character of the property. Mrs. Alexander's Cotton, supra. It is well known that steamers constituted one principal reliance of the insurgents as a means of transportation for troops, commissaries' supplies and munitions of war. A fortiori in the hands of the insurgent troops, and actually in use by them in promoting the Rebellion, was this steamer a proper object of capture by the union forces? After her capture, and while still in the possession and use of the United States forces, the libellant seeks to regain possession of her and take her from the hands of her captors, by an appeal to the admiralty courts of the United States. We think it clear that he had no claim. The title of the United States was perfect and complete by capture in war and was not open to adjudication in the courts.

The fact that the libellant afterwards came within the United States military lines, and took the oath referred to in his libel, could not divest the title of the government. That was perfect and was not liable to any such defeasance. But it is charged in the libel that there had never been any legal adjudication or condemnation of the steamer. No legal condemnation was necessary or proper. By express provision of the act of March 12, 1863 (12 Stat. 820), captured property might either be sold and the proceeds turned into the treasury or it might be appropriated to public use on due appraisement. There is nothing in this record to show that this property was not so appropriated to the public use. Commencing legal proceedings is a novel method of wresting from the hands of military captors property taken from the enemy in open war. I find nothing in this record to show that libellant has any title to the property libelled. The libel is therefore dismissed at the costs of the libellant.